UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| KRISTEN GIBBS, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | CIVIL ACTION H-18-4278 |
| § | |
| CITY OF HOUSTON, § | |
| § | |
| Defendant. § | |

**MEMORANDUM OPINION AND ORDER**

Pending before the court is a motion for summary judgment filed by defendant City of Houston ("the City"). Dkt. 19. Plaintiff Kristen Gibbs responded (Dkt. 22), and the City replied (Dkt. 25). The City also moved to strike Gibbs' personal declaration. *Id*. The court requested supplemental briefing from both parties regarding Gibbs' declaration. Dkt. 31. The City filed a brief (Dkt. 37), but Gibbs did not. Having considered the motion, response, reply, supplemental brief, and applicable law, the court is of the opinion that the City's motion for summary judgment should be GRANTED.

**I. BACKGROUND**

Lieutenant Kristen Gibbs is a female officer with the Houston Police Department ("HPD"). Dkt. 22. Gibbs began working for the City as a police officer in 1996. Dkt. 22-2 at 16. She has worked in the Homicide Division and the Chief's office. *Id.* at 159. In June 2015, Gibbs was promoted to an Administrative Lieutenant position under Captain Campbell ("Campbell") in the Southeast Division. *Id.* at 19, 22. During her interview for that position, Campbell told Gibbs he did not want "any drama," in what Gibbs now believes was a reference to a previous female

lieutenant.[1] Dkt. 9 at 3. Campbell relied heavily on Gibbs in her new role, often making her acting captain when he was out and once sending her to a meeting in his place. *Id.*

Shortly after Gibbs started her new position, she became concerned about Campbell's treatment of subordinates and talked to him about her concerns that he was "condescending" and "belittling" to subordinates. Dkt. 22-2 at 35–36.[2] Still, Campbell allegedly continued to speak to Gibbs in a "condescending" manner. *Id.* at 46. According to Gibbs, whenever she asked Campbell not to speak to her in a disrespectful manner, he told her to "calm down" or not to "be so emotional." *Id.* at 75, 142, 145. Gibbs discussed her concerns about Campbell's treatment of subordinates with him two more times. Dkt. 9 at 3.

Then during September 2015, Campbell allegedly yelled at female sergeant Lisa Hinds ("Hinds") and "pounded his desk in a hostile manner," which Hinds reported to Gibbs. Dkt. 22-2 at 42–43. Hinds asked Gibbs to drive her to HPD headquarters the next day so that Hinds could file a complaint with the Internal Affairs Division ("IAD"), which Gibbs did. Dkt. 22 at 3. Campbell was allegedly upset with Gibbs when he found out that she drove Hinds to file a complaint against him, and he began treating Gibbs and Hinds more poorly than "comparators."[3] Dkt. 9 at 4. In January 2016, Campbell told Gibbs that he could not work with her anymore because their relationship had become adversarial. *Id.* Gibbs repeatedly talked to Assistant Chief

---

[1] In a motion for summary judgment, the court must consider the facts of the case in the light most favorable to the plaintiff. *See Boren v. U.S. Nat'l Bank Ass'n*, 807 F.3d 99, 104 (5th Cir. 2015) ("In reviewing summary judgment, we construe all facts and inferences in the light most favorable to the nonmoving party.").

[2] For convenience, the court references the electronic page numbers on all exhibits rather than the pagination on the exhibits themselves.

[3] Gibbs alleges that she was treated "less favorabl[y] than comparators" but does not explain who those comparators are. Dkt. 9 at 4.

Finner ("Finner") throughout this time about Campbell's allegedly inappropriate behavior. *Id.* at 3–4.

On April 6, 2016, the tension between Campbell and Gibbs culminated in a confrontation in front of several other subordinates. *Id.* at 4. Gibbs sent Campbell an email with an attachment to prepare for an interview with a job candidate. Dkt. 22-2 at 90–93. When Gibbs asked Campbell if he had reviewed her email and the proposed interview questions in the attachment, he allegedly laughed at Gibbs and claimed that she had not sent it. *Id.* at 91. After a brief exchange, he realized that he had not scrolled down far enough in the email to see the attachment. *Id.* at 93. He said "something along the lines [of] 'Oh, I guess I didn't see it.'" *Id.* Gibbs felt humiliated and belittled by this interaction, and she went to her office. *Id.* at 93–94.

Later that day, there was another confrontation between Gibbs and Campbell when Gibbs refused to interview a job candidate who did not submit the required paperwork for an application. Dkt. 22-2 at 84–88. Gibbs believed it would violate HPD protocol to interview a candidate with an incomplete application and could result in a grievance against Gibbs' department. Dkt. 19-4 at 12. Gibbs called the Transfers and Promotions Unit ("TAP") about the issue, and Officer Chapman ("Chapman") told Gibbs that it was grievable to interview that candidate. Dkt. 22-2 at 86. When Gibbs told Campbell that she did not think they should interview the candidate, Campbell disagreed. *Id.* Gibbs then called TAP on speakerphone with Campbell in her office to verify protocol because she "hop[ed] that [Campbell] might be willing to listen" to TAP. Dkt. 19-4 at 12. Campbell told Gibbs that she was "out of line" and reminded her of his rank as commander. *Id.* Gibbs then told Campbell, "I don't give a shit what you do with the interviews. I'm leaving. I think I'm going to be sick." Dkt. 22-2 at 87–88. Gibbs then left for the day. *Id.* at 88.

3

When Gibbs left, she called Finner's office, but he could not see her that day. *Id.* at 98. His staff advised her to address her concerns with the IAD or Alternative Dispute Resolution ("ADR"). *Id.* Before she went to ADR, Gibbs went to the TAP unit to see if there were any open lieutenant positions to which she could apply for a transfer. *Id.* at 99. There were no positions available. *Id.* Gibbs then filed a complaint with ADR, which was eventually received by the IAD. Dkt. 22 at 4.

Many of the subsequent facts are disputed. During the investigation of Gibbs' complaint, both Gibbs and Campbell were given no-contact orders. Dkt. 22-2 at 116. Gibbs alleges that Campbell filed a "counter complaint" against her for insubordination, but the City denies this.[4] Dkt. 22 at 4; Dkt. 25 at 5. The City contends that Campbell never filed any complaints against Gibbs; instead, the City's "thorough investigation" into Gibbs' complaint revealed that Gibbs violated HPD rules. Dkt. 25 at 5–6. Either way, as a result of findings during the investigation, Gibbs received a written reprimand for insubordination for her conduct on April 6, 2016. Dkt. 19-7; Dkt. 22 at 4. The IAD found no fault on the part of Campbell. Dkt. 22 at 7. After additional investigation, the IAD's findings were confirmed. Dkt. 22-2 at 132–33.

Gibbs argues that the IAD's investigation was flawed because they did not interview some of the witnesses listed in her complaint. *Id.* at 132–34. For that reason, Gibbs filed a grievance. Dkt. 19-9. The grievance examiner upheld Gibbs' written reprimand and found that "Gibbs, whatever her reasons, acted in a disrespectful and insubordinate manner against her superior" in two separate incidents: first, in the confrontation between Gibbs and Campbell about the email

---

[4] In Gibbs' declaration, she seemingly acknowledges that Campbell did not file a complaint against her, but she still alleges that Campbell used the Internal Affairs process to make false statements about her. Dkt. 22-4.

4

mishap "with other HPD personnel in close proximity," and second, "in a separate incident . . . in [her] office" that same day when Gibbs and Campbell argued about whether to interview the job candidate who submitted an incomplete application. *Id.* at 3. As a consequence of the written reprimand, Gibbs "had to complete additional education and training for professionalism and anger management." Dkt. 22 at 8. A suspension was recommended, but because of a procedural issue, Gibbs was not suspended. Dkt. 22-2 at 135–37. Gibbs concedes that the written reprimand did not come with a reduction of pay or a formal demotion. *Id.* at 137.

After the conclusion of the investigation, Gibbs was sent back to her regular assignment working for Campbell. *Id.* at 138. To avoid working with Campbell, Gibbs requested a temporary "floating" position which would have allowed her to "float" between departments until another position became available, but that request was denied. *Id.* at 180–81. A couple weeks later, she voluntarily transferred to Inspections, which she contends is a "less desirable unit." Dkt. 22 at 5, 11–12. Gibbs alleges that she did not want to transfer but that she felt she had no choice because she "wanted to get away from" Campbell. Dkt. 22-2 at 156–57. Gibbs has since applied to transfer out of Inspections several times, but her requests have been denied; she attributes the denials to her disciplinary reprimand.[5] Dkt. 22 at 4; Dkt. 22-2 at 161–63. Notably, her performance evaluations have been very positive in Inspections and have reflected her "strong and outstanding" work. Dkt. 22-2 at 163. Still, Gibbs argues that the written reprimand has impacted her ability to seek promotions because no one will want to "bring a lieutenant to their division . . . with this record." *Id.* at 170.

---

[5] Gibbs acknowledges that HPD policy requires her to remain in Inspections for at least two years after her voluntary transfer, but she contends that her transfer requests have been denied because of her disciplinary reprimand. Dkt. 22 at 4; Dkt. 22-2 at 161–63.

Additionally, before the disciplinary reprimand and Gibbs' subsequent transfer, Gibbs was a Division Training Coordinator ("DTC"), for which she received an extra $150 a month. Dkt. 9 at 6; Dkt. 22-2 at 158–59. She no longer receives DTC pay. Dkt. 22-2 at 158–59. She still works the day shift, but she had to change her work schedule slightly because her new position in Inspections requires a longer commute. *Id.* at 139. Gibbs filed this employment discrimination suit after the EEOC issued notice of Gibbs' right to sue. Dkt. 9 at 7. The motion for summary judgment is ripe for disposition.

## II. LEGAL STANDARD

A court shall grant summary judgment when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] fact is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party." *Fordoche, Inc. v. Texaco, Inc.*, 436 F.3d 388, 392 (5th Cir. 2006). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2540 (1986). If the moving party meets its burden, the non-moving party must set forth specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e). The court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor. *Env't. Conservation Org. v. City of Dallas*, 529 F.3d 519, 524 (5th Cir. 2008).

## III. ANALYSIS

"Title VII of the Civil Rights Act of 1964 makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Williamson v. City of Houston*, 148 F.3d 462, 464 (5th Cir. 1998) (quoting 42

U.S.C. § 2000e–2(a)(1)). Gibbs argues that the City violated Title VII by discriminating against her on the basis of sex and retaliating against her in violation of Title VII. Dkts. 9, 22. The City argues that Gibbs cannot establish a prima facie case for either of her claims, and thus, summary judgment is appropriate. Dkt. 20 at 16. The City also moved to strike Gibbs' declaration. Dkt. 25 at 2–3. The court will first address the City's motion to strike.

**A. Motion to Strike**

The City moved to strike Gibbs' declaration (Dkt. 22-4) within its reply brief and again in its supplemental brief addressing Gibbs' declaration. Dkts. 25, 37. According to Federal Rule of Civil Procedure 56(c)(4), a declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." Fed. R. Civ. Pro. 56(c)(4). "While a declaration need not specifically state that it is based on personal knowledge, it must include enough factual support for a court to determine that its averments were based upon the personal knowledge of the declarant." *Gahagan v. U.S. Citizenship & Immigr. Servs.*, 147 F. Supp. 3d 613, 621 (E.D. La. 2015). If a district court decides that portions of a declaration are inadmissible, it should strike only the sections "that are inadequate and consider the rest." *Akin v. Q-L Invs., Inc.*, 959 F.2d 521, 531 (5th Cir. 1992). Gibbs' declaration makes multiple conclusory statements, improbable inferences, and unsubstantiated assertions outside of her personal knowledge. Dkt. 22-4. However, some of the assertions in Gibbs' declaration are within her personal knowledge. Thus, the court GRANTS the motion to strike but only as to the contested sections of Paragraphs Three (speculating about Campbell's reasons for his response statement in the IAD investigation of Gibbs' complaint against Campbell and the impact of the written reprimand on Gibbs' career), Four (speculating that the City sent her back to her former job at the end of the investigation to punish her), Five (speculating about

Campbell's thoughts regarding Gibbs' return to her former position), and Six and Seven (speculating as to the City's motives in refusing to allow Gibbs to move to a floating position). Dkt. 25 at 2–3. The court will not consider the aforementioned sections of Gibbs' declaration in its analysis.

**B. Sex Discrimination Claim**

"A plaintiff may prove Title VII discrimination through direct evidence or circumstantial evidence." *Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 593 (5th Cir. 2007). If the plaintiff does not have direct evidence of discrimination, like in Gibbs' case, the plaintiff may establish sex discrimination through circumstantial evidence using the *McDonnell Douglas* burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817 (1973). *See, e.g., Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001). Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of discrimination. *Id.* Then the burden shifts to the employer to produce a "legitimate, non-discriminatory reason" for its actions. *Id.* To establish a prima facie case of sex discrimination, a plaintiff must show that "(1) she is a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) others similarly situated were more favorably treated." *Rutherford v. Harris County*, 197 F.3d 173, 184 (5th Cir. 1999). If the plaintiff fails to establish a prima facie case of discrimination, then "the court does not have to reach the subsequent burden-shifting analysis under *McDonnell Douglas*." *Agoh v. Hyatt Corp.*, 992 F. Supp. 2d 722, 736 (S.D. Tex. 2014) (Harmon, J.).

It is undisputed that Gibbs is a member of a protected class and that she was qualified for her position. Dkt. 19. However, the City contends that Gibbs has not suffered an adverse employment action for several reasons. *Id.* at 8–11. First, the City contends that Campbell's

alleged actions do not constitute an adverse employment action for purposes of Title VII. *Id.* at 8–9. Gibbs agrees that Campbell's behavior alone does not constitute an adverse employment action. Dkt. 22 at 7. Instead, she argues that the adverse employment action is not Campbell's behavior but the City's written reprimand of Gibbs, along with Gibbs' transfer to Inspections, which Gibbs contends is a "constructive demotion . . . as a result of Campbell's misogynistic attitude." *Id.* The City contends that Gibbs' transfer was not an adverse employment action because it was voluntary. Dkt. 19 at 9–11. The City also argues that Gibbs' written reprimand was not an adverse employment action because it was "without consequence." *Id.* at 9.

To support their arguments, both the City and Gibbs cite to the *Sharp* case. *Id.* at 10; Dkt. 22 at 7–9. In *Sharp*, the Fifth Circuit affirmed a jury verdict in favor of a former HPD officer plaintiff who had experienced severe sexual harassment from two supervisors. *Sharp v. City of Houston*, 164 F.3d 923, 926 (5th Cir. 1999). The supervisors' behavior in that case was egregious. *Id.* For example, a sergeant once "announced in front of over one hundred officers and police cadets that [the plaintiff] 'need[ed] to be in a wet T-shirt contest.'" *Id.* When the plaintiff asked for time off, the same sergeant "joked that he had keys to a motel room where they could go to 'discuss the matter.'" *Id.* at 927. He once told the plaintiff "that he would approve her vacation request if she brought back pictures of herself on a nude beach" and "suggested that [the plaintiff] and another female officer tell others that they had engaged in a sexual threesome with him." *Id.* Additionally, the sergeant's supervising lieutenant not only failed to stop the harassment but also harassed the plaintiff himself. *Id.* Once during roll call in front of other officers, the lieutenant "walked up to [the plaintiff] and unzipped his pants, placing his crotch inches from her face" and made a "reference to oral sex." *Id.*

9

Although the plaintiff did not file a complaint against her supervisors for fear of retaliation, their misconduct was revealed during a separate investigation, and they were both suspended without pay and permanently transferred out of the unit. *Id.* Still, the plaintiff's fellow officers retaliated against her for "breaking the 'code of silence,' a custom within HPD of punishing officers who complain of other officers' misconduct." *Id.* Her name was removed from an overtime sign-up sheet in her unit, and roll call was once held without her. *Id.* She had a car accident on the way to work, and her colleagues did not "immediately come to her assistance." *Id.*

The plaintiff asked her new supervisor for help, "but he took no corrective action." *Id.* at 927–28. Instead, he downplayed the retaliation and "even openly blamed her for embarrassing the unit and for causing strife within it." *Id.* at 928. The plaintiff eventually requested a voluntary transfer to a less prestigious unit, which the city argued could not be an adverse employment action because it was voluntary. *Id.* at 933–34. The *Sharp* court rejected that argument and held that the plaintiff's voluntary transfer could constitute a "non-trivial adverse employment action" because "the jury could have found that the transfer, albeit at [the plaintiff's] request, was a constructive demotion, the involuntary result of conditions so intolerable that a reasonable person would feel compelled to leave."[6] *Id.* The court noted that "[t]o be equivalent to a demotion, a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position proves objectively worse—such as being less prestigious or less interesting or providing less room for advancement." *Id.* at 933.

---

[6] The *Sharp* case addressed retaliation claims under 42 U.S.C. § 1983. *Sharp*, 164 F.3d at 932–33. However, the *Sharp* court noted that although there may be differences between § 1983 and Title VII, "under both statutes demotions can be adverse employment actions." *Id.* at 933 n.21. Since Gibbs' legal theory is premised on her alleged demotion, the differences between the definitions of "adverse employment action" in Title VII and § 1983 are not implicated here.

Gibbs contends that her new role in Inspections is "less prestigious" and "provides less room for advancement." Dkt. 22 at 9. Accordingly, Gibbs argues that her transfer was a constructive demotion constituting an adverse employment action like the plaintiff's transfer in *Sharp* because any reasonable person in Gibbs' situation would have felt compelled to leave. *Id.* However, even assuming without deciding that the position to which Gibbs voluntarily transferred is objectively worse and could thus be considered a demotion, her transfer is not a constructive demotion because Gibbs does not provide evidence of intolerable working conditions so that a reasonable person would feel compelled to leave. *See Sharp*, 164 F.3d at 934 (holding that a constructive demotion occurs when a plaintiff transfers as an "involuntary result of conditions so intolerable that a reasonable person would feel compelled to leave"); *Banks v. E. Baton Rouge Par. Sch. Bd.*, 320 F.3d 570, 580 n.14 (5th Cir. 2003) (noting in dicta that plaintiffs "presented no evidence suggesting that they felt compelled to request a transfer" and thus, a move to a new position likely could not be characterized as a constructive demotion); *Obondi v. UT Sw. Med. Ctr.*, No. 3:15-CV-2022-B, 2017 WL 2729965, at *7 (N.D. Tex. June 23, 2017) ("An employee's voluntary transfer to a lower position does not qualify as an adverse employment action absent some further proof of work conditions so intolerable as to constitute constructive demotion.").

In contrast to the plaintiff in *Sharp* who endured egregious treatment from supervisors and colleagues alike, Gibbs' only evidence of intolerable working conditions is that she did not want to work for Campbell after she filed a complaint against him for gender discrimination and then was cited for insubordination herself. Dkt. 22 at 9. She contends that "[a]ny reasonable person would feel the same." *Id.* The court disagrees. The fact that Gibbs was cited for insubordination after filing a complaint against a supervisor does not by itself establish an issue of material fact as to whether a reasonable person would feel compelled to transfer. Gibbs submits no evidence

11

suggesting that receiving a written reprimand somehow made her working conditions under Campbell intolerable. She submits no evidence of mistreatment upon her return to her former position. Accordingly, Gibbs' voluntary transfer was not a constructive demotion.

Gibbs also contends that the City's disciplinary action against Gibbs, including the suspension recommendation, was in and of itself an adverse employment action.[7] Dkt. 22 at 7, Dkt. 22-2 at 135–38. In Title VII discrimination cases, adverse employment actions are limited to actions "that affect employment or alter the conditions of the workplace." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62, 126 S. Ct. 2405 (2006) (noting that, in contrast to Title VII's anti-retaliation provision, Title VII's substantive provision is limited to employer actions which affect the terms and conditions of employment). "[A]dverse employment actions consist of 'ultimate employment decisions' such as hiring, firing, demoting, promoting, granting leave, and compensating." *Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014) (quoting *McCoy v. City of Shreveport*, 492 F.3d 551, 560 (5th Cir. 2007)). Gibbs contends that her disciplinary reprimand could affect her in the future when she applies for promotions, but she submits no evidence suggesting that she was denied a promotion because of the reprimand. Dkt. 22 at 7–8; *see also Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 825 (5th Cir. 2019), *cert. denied*, No. 19-1121, 2020 WL 3492666 (U.S. June 29, 2020) (holding that teacher plaintiff who argued that her placement on a "Teacher in Need of Assistance" plan would interfere with future promotions could not establish an adverse employment action because she "failed to identify a position to which she applied or was discouraged from applying" after placement on the plan). Gibbs' completion of additional education and training as a result of her reprimand is not an ultimate

---

[7] Additionally, Gibbs argues that the written reprimand itself was a retaliatory action in violation of Title VII. Dkt. 22 at 11–12. The court addresses that issue separately. *See infra* Part III.C.

employment decision affecting or altering the conditions of her job; Gibbs suffered no loss of compensation or benefits and was not demoted or fired.[8]  Dkt. 22-2 at 135–38.  Thus, Gibbs' allegations are insufficient to create an issue of material fact as to whether she suffered an adverse employment action.[9]  *See Green v. Adm'rs of Tulane Educ. Fund*, 284 F.3d 642, 658 (5th Cir. 2002), *overruled on other grounds by Burlington*, 548 U.S. at 66 ("[D]isciplinary actions in the form of reprimands, do not constitute ultimate employment decisions"); *Hernandez v. Sikorsky Support Servs., Inc.*, 495 F. App'x 435, 438 (5th Cir. 2012) (same); *Lopez v. Kempthorne*, 684 F. Supp. 2d 827, 855 (S.D. Tex. 2010) (noting that "[d]isciplinary write-ups . . . fail to qualify as adverse employment actions" and that "[b]y themselves, documented reprimands, though potentially affecting future employment decisions, do not qualify as adverse employment decisions"); *Thompson v. Exxon Mobil Corp.*, 344 F. Supp. 2d 971, 982 (E.D. Tex. 2004) ("Disciplinary write-ups . . . do not constitute adverse employment actions.").  *But see Welsh*, 941 F.3d at 824 (declining to address "the question of whether reprimands are properly viewed as constituting adverse employment actions" and noting in dicta that some Fifth Circuit cases have held that reprimands can constitute adverse employment actions).

Moreover, even if Gibbs could establish an issue of material fact as to whether she suffered an adverse employment action, Gibbs does not provide evidence of a similarly situated comparator.

---

[8] Gibbs' pay decreased when she transferred to Inspections because she no longer received her DTC pay, but her disciplinary reprimand did not cause that loss—Gibbs' voluntary transfer resulted in the loss of her DTC pay.  Dkt. 22-2 at 155–56.

[9] Additionally, Gibbs argues that the City's requirement that she attend disciplinary meetings prior to her final disciplinary recommendation was an adverse employment action because Gibbs was "treated as though she was being interrogated" and "had to re-live [sic] the complaint she filed" in an internal affairs meeting.  Dkt. 22 at 9.  Required attendance at meetings for an investigation is not an adverse employment action because it is not an ultimate employment decision.  *See, e.g.*, *Cardenas-Garcia v. Tex. Tech Univ.*, 118 F. App'x 793, 794 (5th Cir. 2004) ("Performance reviews and [disciplinary] investigations . . . do not qualify as ultimate employment actions.").

To establish disparate treatment, Gibbs must show that a similarly situated comparator outside of the protected class of which Gibbs is a member was treated differently than her under "nearly identical" circumstances. *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 406 (5th Cir. 2005) (quoting *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir.1995)). Gibbs argues that Campbell is a similarly situated comparator because (1) he is male and outside of her protected class, (2) he also filed a complaint with the IAD, and (3) his complaint resulted in a disciplinary action against Gibbs, whereas her complaint was not properly investigated. Dkt. 22 at 10–11. First, there is no evidence that Campbell filed a complaint with the IAD. The City contends that its investigation into Gibbs' complaint against Campbell revealed the incident for which Gibbs was disciplined. Dkt. 25 at 5. Gibbs seemingly acknowledges that Campbell did not file a complaint against her in her declaration in which she states that Campbell understood that "he could not just file a retaliatory complaint against [her]." Dkt. 22-4. However, even if Campbell had filed a complaint against Gibbs, Campbell and Gibbs would still not be similarly situated. The Fifth Circuit has "specifically addressed the plaintiff-employee's burden of proof in disparate treatment cases involving separate incidents of misconduct and [has] explained consistently that for employees to be similarly situated those employees' circumstances, including their misconduct, must have been 'nearly identical.'" *Perez v. Tex. Dep't of Crim. Just., Inst'l Div.*, 395 F.3d 206, 213 (5th Cir. 2004) (listing cases). Gibbs accused Campbell of gender discrimination mostly with conclusory allegations about his behavior, whereas Gibbs received a written reprimand for insubordination which was supported by multiple officers' statements. *Compare* Dkt. 19-7 *with* Dkt. 22-3. "If the 'difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer,' the employees are not similarly situated for the purposes of an employment discrimination analysis." *Lee v. Kan. City S.*

14

*Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) (quoting *Wallace*, 271 F.3d at 221). Additionally, "[e]mployees with different supervisors, who work for different divisions of a company" and employees with "different work responsibilities . . . are not similarly situated." *Id.* at 259–60. Gibbs and Campbell have different titles, supervisors, and work responsibilities. Dkt. 22. Thus, Gibbs and Campbell are not similarly situated.

Gibbs' allegations against Campbell show that she believes that Campbell is not a pleasant person with whom to work, but Title VII is not a "general civility code." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S. Ct. 998 (1998). It is possible that Campbell's alleged statements to Gibbs about how she needed to "calm down" and not be "so emotional" may have been motivated by stereotypes about women. Dkt. 22 at 3. However, these statements and the other evidence which Gibbs provides are not enough to establish a prima facie sex discrimination case for the reasons previously mentioned. Therefore, the City's motion for summary judgment on Gibbs' employment discrimination claim is GRANTED.

**C. Retaliation Claim**

To establish a prima facie case of retaliation in violation of Title VII, "a plaintiff must show that (1) she participated in an activity protected under the statute; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse action." *Feist v. La., Dep't of Just., Office of the Att'y Gen.*, 730 F.3d 450, 454 (5th Cir. 2013). If the plaintiff makes a prima facie showing of retaliation, the burden of production shifts to the employer to "articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action." *McCoy*, 492 F.3d at 557. "If the employer meets its burden of production, the plaintiff then bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory or retaliatory purpose." *Id.* Title VII's

15

"antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington*, 548 U.S. at 67.

It is undisputed that Gibbs engaged in protected activity, but Gibbs cannot establish a genuine issue of material fact as to whether the City took an adverse employment action against her. In the context of a retaliation claim, an adverse employment action must be "materially adverse" so that "the employer's actions . . . could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 57. Gibbs largely reiterates the same allegations she uses to support her sex discrimination claim for her retaliation claim.[10] Dkt. 22 at 11. Specifically, Gibbs alleges that the City took adverse employment actions against her by (1) disciplining Gibbs with a written reprimand, (2) returning Gibbs to work under Campbell instead of providing her a floating position, and (3) forcing her to transfer to another unit. *Id.* at 11–12. Gibbs' transfer does not constitute a materially adverse employment action because it was voluntary and would not dissuade a reasonable worker from making a charge of discrimination; the court has already rejected Gibbs' argument that her transfer was a constructive demotion. *See*

---

[10] The court requested supplemental briefing as to the allegations in Gibbs' declaration (Dkt. 22-4) that during the investigation into Gibbs' complaint against Campbell, Gibbs' name was replaced on the phone display and her office was given to another lieutenant who ordered business cards with Gibbs' former phone number on them. Dkt. 31. Gibbs did not provide supplemental briefing. An adverse employment action for a retaliation claim must be "materially adverse" so that it could dissuade a reasonable worker from making a charge of discrimination. *Burlington*, 548 U.S. at 57. Without something more, Gibbs' discovery that another lieutenant was in her office and had been assigned her phone number during the lengthy investigation period is not materially adverse so that it would dissuade a reasonable worker from alleging discrimination. Dkt. 22-4. The City's actions are more like "petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington*, 548 U.S. at 68; *see also Higbie v. Kerry*, 605 F. App'x 304, 310–11 (5th Cir. 2015) (moving employee's desk from the eleventh floor to the seventh did not create a fact issue as to whether plaintiff had suffered an adverse employment action); *Wooten v. St. Francis Med. Ctr.*, 108 F. App'x 888, 891 (5th Cir. 2004) (moving plaintiff's office did not constitute an adverse employment action). Thus, Gibbs' aforementioned allegations do not create a fact issue as to whether the City took adverse employment actions against her.

*supra* Part III.B. Further, Gibbs presents no evidence that the City should have provided her with a floating position except her own conclusion that the City should have done so. Dkt. 22 at 12. Gibbs' request to float between departments is essentially a request for a lateral transfer to a temporary position. Denying a lateral transfer request is not a materially adverse employment action because it would not dissuade a reasonable worker from making a discrimination charge. *See Sabzevari v. Reliable Life Ins. Co.*, 264 F. App'x 392, 396 (5th Cir. 2008) (holding that denial of a lateral transfer request was not a materially adverse employment action); *Butler v. Tex. Health & Hum. Servs. Comm'n*, No. CIV.A. H-13-1030, 2014 WL 1933670, at *5 (S.D. Tex. May 13, 2014) (Werlein, J.) ("Plaintiff presents no evidence that her transfer request was not purely lateral, and thus, has not demonstrated that its denial was a materially adverse employment action."). Gibbs presents no evidence which suggests that her request to transfer to a floating position is "anything but a lateral transfer in terms of pay, promotional opportunities, working conditions, and other objective factors." *Sabzevari*, 264 F. App'x at 396. Thus, the City's denial of Gibbs' request for a floating position is not an adverse employment action.

Additionally, the City's act of returning Gibbs to her former position after the "shielding period"[11] is not an adverse employment action; it would not dissuade a reasonable employee from supporting or making a charge of discrimination, and Gibbs submits no evidence that she experienced any kind of retaliation or poor treatment when she returned to her position.[12] Dkt. 22

---

[11] The shielding period occurs during an investigation into a discrimination complaint. Dkt. 22-2 at 116–17. During the shielding period, the complainant is "shielded" by a no-contact order from the person who allegedly engaged in discriminatory conduct. *Id.*

[12] In Gibbs' deposition, she acknowledges that she was returned to her former position because the shielding period ended:
Q: Now, after you received this written reprimand, were you involuntarily transferred?
A: I was not involuntarily transferred, but I was forced to go back to work for Captain Campbell.
Q: Okay, so that wasn't a transfer, was it?

17

at 11–12. Thus, the only remaining question is whether a written disciplinary reprimand constitutes a materially adverse employment action, and in Gibbs' case, it does not.

Although disciplinary reprimands which result in serious consequences may be adverse employment actions, "[w]ritten reprimands or warnings . . . generally are not adverse employment actions, particularly when they are issued in response to work-rule violations and do not dissuade the employee from pursuing complaints." *Brooks v. Houston Indep. Sch. Dist.*, 86 F. Supp. 3d 577, 586 (S.D. Tex. 2015) (Rosenthal, J.). As a result of Gibbs' reprimand, Gibbs "had to complete additional education and training for professionalism and anger management." Dkt. 22 at 8. Gibbs' pay was not reduced, nor was she suspended or demoted. Dkt. 22-2 at 135–37. Moreover, Gibbs' reprimand could only be considered in subsequent discipline for a year. Dkt. 37 at 3. A written reprimand for which the primary consequence was additional education and training would not dissuade a reasonable employee from supporting or making a charge of discrimination. *Compare Baig v. McDonald*, 749 F. App'x 238, 241 (5th Cir. 2018) (holding that written reprimand which "had no practical effect on [the plaintiff's] job duties, pay or benefits" did not constitute an adverse employment action), *and DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 F. App'x 437, 442 (5th Cir. 2007) (holding that written warning was not an adverse employment action because there were "colorable grounds for the warning" and it did not dissuade the plaintiff from filing a charge of discrimination several weeks later), *with Turner v. St. Luke's Episcopal Health Sys.*, No. CIV.A. H-06-1668, 2008 WL 706709, at *17 (S.D. Tex. Mar. 14, 2008) (Rosenthal, J.) (holding that a reprimand with a 90-day probation was a materially adverse employment action). Thus, Gibbs' written reprimand is not an adverse employment action.

---

A: That was just the end of the shielding period.
Dkt. 22-2 at 138.

However, even if Gibbs could establish that her written reprimand was a materially adverse employment action caused by Gibbs' engagement in protected activity, the City has a legitimate, nonretaliatory reason for Gibbs' disciplinary reprimand. The City contends that it reprimanded Gibbs because the City has a general order which states that "[e]mployees shall not flout the authority of a superior by displaying disrespect or disputing a supervisor's orders." Dkt. 19-7 at 5. The City found that Gibbs was "insubordinate when [she] flouted . . . Campbell's authority by engaging in intentional disrespectful behavior toward him while in the presence of subordinate employees" during the April 2016 incident when Gibbs confronted Campbell about the email she sent him. Dkt. 19-7 at 2; Dkt. 19-9; *see supra* Part I. The City found that Gibbs was also insubordinate during her interaction with Campbell later that same day in Gibbs' office when they argued about whether to interview a candidate with incomplete paperwork. Dkt. 19-9. Gibbs' reprimand was upheld on appeal through the City's grievance process. Dkt. 19-9; Dkt. 22-2 at 137. Gibbs submits no evidence suggesting that the City's proffered reason for her reprimand is pretextual. Accordingly, Gibbs fails to establish a genuine issue of material fact as to whether the City took retaliatory action against her in violation of Title VII. Thus, the City's motion for summary judgment on Gibbs' retaliation claim is GRANTED.

### IV. Conclusion

For the aforementioned reasons, the City's motion for summary judgment is GRANTED. Gibbs' claims are DISMISSED WITH PREJUDICE.

Signed at Houston, Texas on December 28, 2020.

_____
Gray H. Miller
Senior United States District Judge